The next case is Penn-Star v. Dongbu Insurance. Good morning. May it please the Court, my name is Joanna Roberto and I represent the defendant, Dongbu, in this matter.  Although elementary, it's important here to understand what Estoppel is and what Estoppel is not. Estoppel is a doctrine that prevents unfair surprise. But it's a doctrine that does not create or manufacture coverage where there isn't any. I don't understand what the distinction is really as a practical matter. Estoppel, if it is appropriate to apply Estoppel, prevents you from denying coverage at a later point, right? It's not that simple, Your Honor. Okay, so explain to me what it is. Okay. So in the insurance coverage aspect, with respect to Estoppel, it applies when an insurer has privity, either privity of contract, their status under the policy. For instance, if there's an additional insured, there's an entity that needs to qualify as an insured under the policy. And at that point, the parties are Wait, so you're saying Estoppel can only apply under New York law as between an insurer and its insured? There's two instances. There's, in this situation, I brought up the insured status because that's what we have here with respect to 89th Jamaica. So it can apply with respect to someone who has status or a fiduciary obligation or a relationship with the insurer. So there is the insurer and Wait, but if you have an insured, the person who owns the policy, there's a question about whether the coverage extends to situation X. The insurer says, we agree that you're covered for this. And then three years later, assuming there's some prejudice, but only conditions of Estoppel would apply, the insurer is stopped from denying the coverage. Is that not the right thing? That's correct because So in other words, the Estoppel effectively creates coverage. We say it doesn't. I suppose that's conceptually true, that all it does is prevent you from denying coverage. But the bottom line is they're covered. They're covered to the extent that there's no prejudice. When there's prejudice No, to the extent there is prejudice, they're covered. If there's prejudice Yes, right. Right. But that's a different question than the question, why is it different if a third party, not the party whose policy it is, says, are we covered under this policy? And the insurer says, yes, you are. Now, if they say that, and then the other conditions are met. There's excessive delay in retracting that. And there is some prejudice to the party that was told. Now, those, it seems to me, are the issues in this case. But you're saying they don't even get to start down that path because that would be creating coverage, where in the other situation where the question is the extent of the coverage provided to an acknowledged insured, we don't think of it that way. No, I'm saying that we start with the premise that the insurer believes that the person whose tendering coverage qualifies as an additional insured or an insured, that concept exists on day one. Here, that didn't. So is this argument an interpretation of what they meant in the letter? Or you're saying this just means that there was no way the letter could ever be an offer of coverage? So if Dumbledore was totally explicit and said, 89th Jamaica is not an additional insured, but we've determined that it is going to be entitled to contractual identification, and therefore we're taking over defense and coverage obligations to the fullest extent of the policy, and so you have nothing really to worry about because it's just the same thing as being an additional insured, but that's how we're going to cover it. If they had been so explicit about it, you're saying there still couldn't have been a reliance and there still can't be a stop. Two very different things, Your Honor. You can't be an indemnity. It's an indemnity issue here. It's not an additional insured coverage issue. The additional insured coverage gives you the same rights as the named insured. A contractual indemnity.  The letter does not say that you're an additional insured. It disclaims coverage on the basis of being an additional insured. Correct. But it is possible that an insurer could decide that another party's entitlement to contractual identification is so clear that we're going to accept coverage and, in fact, take over the defense in order to minimize what we're going to ultimately have to pay out. Right? But that's possible. That's a business decision. It could be possible. That's not what happened here under the facts of this case. Before I get to whether it could happen, you're acknowledging it could happen, right? Sure, anything can happen. If you said that, there would be a stop, right? No, but there has to be more than just saying you're a contractual indemnity and I'm going to cover you under the policy based on the contractual, the exception to the contractual liability exception. There has to be conduct. There has to be some prejudice. It's not enough that somebody said that. No, no, no. Prejudice. I'm really hoping you're going to get to the prejudice thing because I think that's an important issue here. But you're starting out by saying no matter what they said, no matter how explicit they were in saying, we think that you are covered under some provision of our policy and we're going to take over the defense, no matter how explicit they were about that, no matter how long it took them to change their mind and say, oh, no, we just figured out that we don't have to do that, and no matter how deeply the other party was prejudiced, there's no such thing as estoppel in that circumstance. There's no such thing as estoppel, Your Honor, in that circumstance. Even under – even if everything else is established as a matter of law that would justify estoppel, this is not there. What – can you tell me what case in New York says that? There is no case in New York which says the opposite. There has to be a reliance on that communication. Where was the reliance here? Dangu did not provide a defense. Dangu did not just continue the third party. These are all issues about whether the doctrine of estoppel as it's defined is satisfied. Your first point is it doesn't matter whether they're satisfied. And I'm trying to figure out whether that's a serious argument. And we spent almost all of your time on it now without getting to the questions of are there prejudice – is there prejudice and, you know, did they take too long? Could this letter be interpreted as saying the things that Judge Menasche says it could have said? And you're insisting that even if it did say what Judge Menasche outlined, there's still no estoppel. There's no estoppel because there was no reliance. You can't create coverage, Your Honor, respectfully, with respect to – But you just told me that you actually do create coverage if it is your insured, that you could create coverage in effect – Yes. By being estopped from denying coverage. So the fact that it creates coverage is no different if it extends the coverage to a different party than if it extends the coverage that is clearly set out in the policy to something that is clearly not set out in the policy. So that party needs to have some status, some privity with the insurer. And what case says that? All the cases that we have cited and that my adversary has cited and that the court, the district court has cited, all involve tenders with respect to a request for additional insured coverage, not contractual indemnification coverage. But that has affected privity between Penn Star and its insurer. I'm sorry. So like Penn Star will have to cover the – or sorry, between Penn Star and Jamaica, right? Penn Star would have to cover Jamaica's losses if Jamaica has to pay, right? Penn Star and Jamaica had options, right? They could have gotten a finding of contractual indemnity in the third-party action, which was still alive and pending until the time of settlement. It could have severed that third-party action and litigated contractual indemnity. It could have done that, but maybe that is the showing of prejudice and it didn't think it was important to do that because it thought that you had agreed to provide coverage on the basis of contractual indemnification. Well, then we get into the timeline, right? The timeline of this case shows that there was no reliance. Even if Penn Star believed that the 2020 letter gave them unconditional coverage, even though it referred to having liability determined first, there was a summary judgment motion. Before we get to the – I'm going to ask about the prejudice, but just before we get to – it doesn't actually refer to having liability determined first, right? It says, we deny a tender on the basis of additional insurance. And then it says, to that end, however, we advise that DB Insurance has agreed to defend and indemnify 89th Jamaica Realty to the fullest extent of its policy limits for this matter and as well as all claims made against 89th Jamaica Realty based on the contractual liability portion of the policy without reservations, right? The letter that was sent later in 2022 does have a lot of references to a finding of contractual indemnification and reserving the right to further disclaim coverage on the basis of other facts and circumstances. But the 2020 letter doesn't have any of such language, right? The 2020 letter says that DB – Dong Bu will provide coverage, defend and indemnify to the fullest extent of its policy based on the contractual liability portion of the policy. Right. That's why they agree to do it. That's the provision that they're relying on in saying we're going to cover you to the full extent without reservation. And if you look at the contractual liability exclusion, that is a coverage that belongs to the insured, which is here. But the whole point is they don't say that in the letter. They don't say, you know, we've got this other provision that might be relevant, but a lot of things have to happen before you get any benefits out of that, so don't rely on us for that reason. They instead say, however, after saying we're not going to give you additional insured liability, we do agree to defend and indemnify your insured, 89th Jamaica, to the fullest extent of its, that is Dong Bu's policy limits for this matter, as well as, as well as all claims made against 89th Jamaica based on the contractual liability portion of the policy without reservation. How can you read that and not say, oh, they're very generous. They're agreeing to take us on. Your Honor, these are letters that are written between two sophisticated companies, two sophisticated insurers. And we can't ignore that the letter refers to the contractual liability portion, which was cited. It was cited for a reason. And it's cited because it says that there is no obligation. JGF becomes legally, there is, I'm sorry, that Dong Bu pays if JGF becomes legally obligated to pay as damages. I get that at this point. You say in your brief that Dong Bu had no obligation to provide a defense to Jamaica Realty, right? Correct. Because it's not additional insured. So when the letter says we advise that Dong Bu has agreed to defend and indemnify 89th Jamaica, how is that language, how can that be reconciled with your position that strict adherence to the terms of the policy would not require them to provide a defense? So the letter, the obligation or the promise made by DB is that if there is a finding of contractual indemnity, which could have been two months after this, could have been five months, could have been a lot sooner. Okay. Can I just ask this question? I get that it's possible to read the letter that way, you know, but the standard is whether the recipient could reasonably understand it to extend coverage. Is it not at least possible to understand this letter as saying, look, you're not an additional insured, but we do have an obligation to cover contractual liability, and we think your entitlement to that is so clear we've agreed to defend and indemnify you for claims because of that provision? Your Honor, I don't agree with that. It's impossible to read the letter that way. Is the letter inartful? Yes. Okay. Is it inelegant? Yes. It's not inartful and inelegant. It's pretty elegant. It says you are not entitled to additional insured coverage. However, nevertheless, we are going to defend and indemnify Jamaica Realty to the full extent of its policy limits for this matter, as well as all claims made against 89th Jamaica. Why are we doing that? Oh, based on the contractual liability portion of the policy, without reservations, with no reservation that says if you don't get a finding of contractual liability, you don't get this. It's without reservation. And at the very end, it does the same thing. It says, again, the DB policy is not endorsed with an additional insured endorsement. Okay, fine. You don't get anything under that. In sum, though, though, in sum, though, DB insurance acknowledges and recognizes its defense and indemnity obligations to 89th Jamaica. For this matter, we acknowledge our obligations to you for this matter, pursuant to the contractual liability coverage. And we take the position somebody else is primary. So if somebody else is primary, then we're secondary, right? That's what they're saying there. If there's a finding of contractual liability. We can't ignore that phrase. That was repeated several times. Excuse me. Where is that if? You are supplying the if. They're saying because of that provision, we take it on. They don't say because of that provision, we take it on conditionally if certain things happen. They didn't say that. Yeah, actually, why don't you answer that question? So I'm looking at the letter. Where in the 2020 letter does it say if there's a finding of contractual liability? Judge, the word if is not there. It says that it is the offer of coverage is made pursuant to the contractual liability coverage. It cites that provision of the policy. Right, but that could mean either we think you're entitled to coverage because of that provision, or it could mean we're just going to adhere to it strictly, which might require a finding. But it doesn't tell you either way. Which then takes us to step two, right, which is the timeline of this case, which is conduct. Yeah, that's actually a stronger argument, right? So you send this letter, but subsequent to the letter, there still is litigation between Jamaica and JGF over contractual identification, right? Correct. But all of that litigation is being conducted by the KBIC appointed counsel, right? KBIC is paying for 89th Street's defense counsel. Right. And 89th Jamaica is kind of overseeing it, but kind of not being super aggressive about telling them what to do, right? Penn Star hired monitoring counsel. Yeah, that's what I mean, Penn Star, right. Yeah, Penn Star hired monitoring counsel, who I don't agree is being passive. I think he's being very active in the case. He's the person who suggested the elevator expert, the radiologist peer review. He's the one who is asking for responses. He's the one who's asking for copies of the medical records. He's asking for information about timeline, settlement, and he is speaking to them. He's doing those things. And if you were conducting the defense, if your lawyer that you hired instead of KBIC's lawyer was conducting the defense, you're saying that the fact that they asked the lawyer to do certain things, which he didn't do for the most part, you'd be off the hook. I mean, that doesn't make a lot of sense to me. The important thing to me seems to be it isn't you at all that's doing this defense. It's KBIC that's doing it at all. They're not relying on you at this point. To say they're not relying on the lawyer because they're paying attention and making suggestions that mostly don't get adopted doesn't seem very persuasive. It seems much more persuasive to say how can they be relying on you when you're not playing any role in this? KBIC is paying the bill. The attorney, through its legal obligation, is defending 89th Realty, right?  And here, what we care about and what the true test is is whether the character and strategy of the case was irreversibly fixed at that time. And it's not because the entire time, Penn Star had a seat at the table, and they did that through their monitoring counsel. Well, at the time of the disclaimer, right, the 2022 letter, it was fixed. Your point is just that it was fixed by KBIC and not by you. Well, I want to be careful about calling the 2022 letter. A disclaimer? The 2022 letter reinstates that it's-  Your position is it reiterates the initial position. And it highlights- By the time we get to this part of the argument, that prejudice, let's assume that it's a disclaimer, right? A late-arriving disclaimer. I understand that's not your position, but we can separate out the different arguments. So by that time, the defense had been done, right? They couldn't go back and change the way the case had been litigated. No, I don't agree. They could reopen the whole case. No. In 2022, at the time of this letter, and I just want to- I wasn't challenging the term. The importance is that it highlighted that unresolved is whether Jamaica Realty bore any responsibility. It is advising Penn Star, 89th Street. It's advising everyone. Liability is still open. Okay? And that was in July of 2022. At that time, JGF had filed motions in limine. The parties were still litigating. They were still litigating. They still had time to sever the third-party action. This is on the eve of a global settlement, right, the 2022 letter? I understand. Maybe that settlement hadn't been signed, so maybe you're saying they could have just refused to settle. No, the settlement was in January of 2023. The letter was July of 2022. Okay. So there was ample time, and it was highlighted in the letter, that liability is still not- hasn't been decided. Why didn't 89th Street or Penn Star or its monitoring councils sever the third-party action and litigate it and ask for a determination of contractual indemnity? Instead, it chose to direct and agree to a stipulation of discontinuance with prejudice against the same person that is here today disputing that we owe anything with respect to this claim. It doesn't make sense. What about the effect on the mediation that your adversary points to? The mediation was in February of 2022, so two years after the infamous 2020 letter. So if Penn Star believed that our policy was up unconditionally and there was no- nothing further to do and that we would come right after TVIC, well, at that point, at the mediation, wasn't it made clear that we weren't giving up our policy? We weren't contributing. We didn't agree on the settlement amount. If the 2020 letter was an offer of coverage that wasn't disclaimed until 2022, you don't- the showing isn't that there's nothing you could have done to try to account for the late disclaimer of coverage. It's that there's any prejudice or any detrimental reliance on the initial offer of coverage, right? There had been a lot of litigation between 2020 and 2022, right? I think there was, Your Honor. There were the motions for summary judgment between the two parties who say that they had a mutual understanding that coverage was given to them without more. So there was a lot of litigation. And from 2020 to 2022, at the time of the mediation, there were motions. Why would the parties file motions for contractual indemnity if they thought- And so maybe they're litigating it, but it's a kind of pro forma matter. And it might have been surprising that there wasn't a summary judgment on that question. Why would there be- and I don't- it's rhetorical. Why would there be summary judgment? Why would there have to be any need for litigation on the issue of contractual indemnity if Penn Star believed that that letter unconditionally offered coverage and offered their policy? The litigation on contractual liability was already ongoing at the time of the 2020 letter, right? Yes, it was ongoing. I don't remember when the third-party action started. So your argument is that by not immediately pulling out of that litigation, we can- there's a question as to whether there was any reliance on the 2020 letter. Right. So if we had picked up and if we believe what Penn Star wants us to believe, which is that the letter agreed to contractual indemnity coverage, then the third-party action would have been discontinued. Right? There would have been no need to litigate the issue of contractual indemnity. As you point out, there is this sort of oddity that the lawyers litigating that question are all appointed by KBIC, so it's possible that Donoghue and Penn Star have an understanding, and then the lawyers appointed by a different insurer are just kind of doing something that they don't pay such close attention to. Is that possible? No, because it wasn't just KBIC's funding and their lawyers. It was Charlie Rule, who was the monitoring counsel, who was paid for by Penn Star from 2014, from the day that the lawsuit started to 2023, to oversee, to make sure that everything was in place and make sure that their, you know, that the interests of their insurers were being adequately protected. So there was an oversight. Wouldn't there always be a monitoring lawyer if somebody else, if a different insurance company is taking responsibility for the defense? Definitely not, Your Honor. Insurance companies are not going to freely appoint, you know, a second layer of coverage, you know, counsel or monitoring counsel just to make sure everything is going fine. No. There was a specific reason why Mr. Rule stayed on for the case. How do we know that? I mean, you may be right. I mean, that may be the practice in the industry, but how are we to make sure of that inference? It just seems like a reasonable thing to do, to have somebody pay attention to what's going on in your name somewhere. Well, that's the whole point of the risk transfer, right? Insurance companies look for the risk transfer opportunities because they don't want to pay out on their policy, which is what happened here. Dongbu wasn't paying for their defense. They had gotten KBIC to pick up for their insured. Penn Star had gotten KBIC to pick up for their insured. So their hands, you know, quote, unquote, were free of this because there was coverage from KBIC. Dongbu also had monitoring counsel at one point when it came to the mediation. Can I ask, so just going back to the 2020 letter, if, in fact, under the terms of the policy, you would only be entitled, you would only be required to provide a payment to ADF Jamaica upon a judicial determination of contractual liability, under what circumstance would Dongbu ever have to defend 89th Jamaica against claims? In a situation where perhaps, well, it wouldn't be S&H Fish because they are defending them, and that would be anti-separation. I don't believe that under any circumstance they would pay for a defense. Okay, so then why does the 2020 letter say we advise that Dongbu has agreed to defend and indemnify 89th Jamaica? And that was my comment earlier. It was inartful. It was inartful because the defense at that point— But not just inartful. You're saying it's completely wrong. They're, like, extending an agreement to provide a service that they should not have done. Well, defense and indemnifying or defendant indemnity is a phrase. It's a phrase that's used— Somebody just kind of unthinkingly threw that phrase in. It's a phrase used within the insurance industry, especially one in which— It's a phrase used within the insurance industry to refer to the kind of obligation you might have to an additional insured. More so to the additional insured, correct. So you're saying that in the 2020 letter, Dongbu inartfully said to 89th Jamaica's insurer, we're going to provide coverage to you as if you were an additional insured. No, that's not what they said. They explicitly rejected the notion of additional insured coverage. But they used the language of that kind of coverage in the very next paragraph. No, they used a term. No, it's nothing more than a term in the industry when responding to a tender. Doesn't the indemnity have some meaning here? I'm sorry? Doesn't the indemnity have some meaning as well? They agreed to indemnify up to the full limits of their policy, and then later in the settlement negotiations, they actually don't do that. They say we're only going to offer a certain amount. Their conduct at the mediation is consistent with this letter, which is we will give you the $1 million that is our policy limit if there's a finding of contractual indemnity, which is required by the policy. But in a settlement negotiation, there's no finding of anything. No. There's a settlement. Then it's a question of are we going to do this or are we not going to do this at all?  Exactly. It's a business decision at that point. Do we continue to litigate? We know that we have a trial with an unpredictable result. We know we have the third-party action that still needs to be resolved. We know we have appeals. So at the mediation, the parties take that into consideration. And it's possible for an insurer like Donoghue to say, well, we're settling it, so we're never going to have an additional determination, but we're going to decide what it's likely that we would have to pay out, and so we're going to pay that in advance for less as part of the settlement, right? The settlement could take different facets. It could be one where it's a global settlement, and the parties agree that we are settling and we're never going to visit the third-party action again. Contractual indemnity is done and buried. It could be a settlement where the parties thereafter litigate coverage afterwards. I understand. I'm well over my time. Thank you, Your Honor. May it please the Court. My name is Stephen Rabeniotis, and I represent Penn Star. Let me start with the last point that you were just given, a whole red herring, I would say. Excuse the expression. It's easy after finality, in hindsight, to look back and say, well, how could you look at this this way? But any time anyone is being defended and has cross-claims against another party, the possibility exists that it could be a $6 million case, could be a $20 million case, such that it's not just the insurance limits that are at play, and insurers are not just obligated to protect their insured up to the dollar amount that we insure. They're obligated to protect and enforce all rights of the insured. What started this whole thing is that 89 Jamaica is the landlord, and it had two tenants that were responsible to it. One tenant was a good and loyal tenant and did everything they said they did. They picked up defense and indemnity, and they actually started defending and were doing the job. We had the same position as to the other tenant. The other tenant gave us lip service and said, yes, we will defend and indemnify you. Oh, by the way, we see somebody else is already defending, so we're going to take the position that we're secondary to them. To us, it didn't matter what their beef was between each other. We knew we had two of them who were both responsible for defense and indemnity, $2 million. $2 million is a lot of money, but we don't know that the case is going to go away for $2 million. It could have been a $6 million, $20 million case. This gets to the question of how is there prejudice, right? How exactly were you prejudiced in this case? Can you explain that? We were prejudiced because we allowed these two primaries that we viewed them, who owed us defense and indemnity, as when somebody says I'm going to pick up defense and indemnity, they're entitled to control defense and indemnity. We could give them ideas. We could still be worried about whether the case is going to end up being a $10 million case and is their insurance going to be enough, but at the end of the day, we still have to evaluate what is going on in the case. But I guess the question is if in fact the 2020 letter said expressly what opposing counsel claims that it meant, which let's say it said we will provide payment to 89th Jamaica only if there's a judicial finding of entitlement to contractual indemnification, what would Penn Star have done differently in the litigation if they were aware of that from the beginning? Let me answer this question, but let me answer it fully. The whole essence of insurance law in New York is by reserving your rights and expressing what covers position they're on. If they had said that, there was no if, as the court said. As a matter of fact, they said the opposite of this. Without reservation of rights. I think Judge Menasche's question is about putting words in his mouth. I mean, he's saying, yeah, okay, but it's reasonable for them to think that it doesn't mean what they say it means. Fine. But the question is how were you prejudiced? And one way of asking the question is how were you prejudiced is what would you have done differently if they had told you what they later said? We would have known that their second opinion is not involved. They're not really participating in the defense with KBIC. They're not really taking this case seriously. And we would have stepped much sooner into the case because you can see what we would have done differently. And what would the consequence of doing that have been? What would that have meant? If you stepped sooner into the case, what's the consequence? Exactly what happened in 2022, Judge. Not only did Charlie rule, but I, two different law firms, stepped in to immediately go to Queens to immediately participate in the trial of this case because once we knew the second million is not up, we knew that it's our money that's on the line and we had to participate. Also, if you knew that at that point, why did you agree to the dismissal with prejudice of the contractual indemnification claim? Because you can't. Exactly as I said when I started, Judge, you can't on behalf of your insured abandon their rights for contractual indemnity. This is a landlord against the tenant. Regardless of what the insurance coverage is for the landlord and the tenant, the landlord still has a claim against the tenant. Let's say it's a $20 million judgment against the landlord. So you never discontinue. But it wasn't. In the litigation, there was a claim by 89th Jamaica against JGF for contractual indemnification. And there was a motion for summary judgment. And the Queens court denied the motion for summary judgment, said that there's an open question about negligence on the part of 89th Jamaica. But the settlement agreement extinguished that claim. Well, that's because you have a settlement now that it was no longer going to be a $6 million amount. I understand, but why not settle with the plaintiff, but continue the litigation between 89th Jamaica and JGF if, in fact, at that point you were on notice that John Woo was taking the position that they don't owe you anything? Your Honor, until you settle with the plaintiff, you don't know whether it's in your rights as an insurance company to then extinguish your insured's rights of contractual indemnity or not. Because until you settle with the plaintiff, a final number with the plaintiff, you don't know whether 89th Jamaica is going to be harmed if you discontinue their contractual claims against the tenant. It's not two insurance companies playing. They were settled at the same time. Yes, that's exactly my point. So you knew the terms on which it was being settled with the plaintiff. That's exactly my point, Judge. Until we got to that point where we were settling with the plaintiff, we could not discontinue the contractual claims of the property owner against the tenant. Only when we reached the point where we knew we could settle with the plaintiff and it was not going to expose 89th Jamaica to its own assets, money beyond insurance, that we could discontinue 89th Jamaica's contractual claims. I think, Judge, I'm not being clear. Let me approach it another way. If we had discontinued the claim that's been suggested by the property owner against the tenant before we reached an agreement with the plaintiff, we wouldn't know what we're discontinuing. You're saying that's why we didn't discontinue it in 2020. Or 2021 or 2022. But you told me a moment ago that once Dong Wu sent the letter to you saying we're not going to provide coverage to you in 2022, you said that you and Mr. Rule leapt into action and got involved in the litigation. But one of the things you did was agree to dismiss the claim for contractual identification of 89th Jamaica against JGM. No, Judge. Let me restate it another way. I want to be clear on this. We did not discontinue the cross part, the cross claims, until we first settled with the plaintiff. We jumped into action to try to get a new expert because they had been totally, the case was on the trial calendar since 2021. The ability to do more discovery, have more experts had been abandoned and lost. We stepped in in 2022 in order to try to cure all those issues. We were not able to cure all those issues. We were irretrievably compromised going to trial in this case. Plaintiff knew that. We had to reach a settlement with the plaintiff before we could end the cross claims. Because let me give you the other scenario. Fine. But actually. We could not before. We could have had a settlement with the plaintiff and not ended the cross claim and pursued the cross claim, right? The purpose of the cross claims from our prosecution point of view was to protect 89 Jamaica from a judgment by the plaintiff against 89 Jamaica for a dollar amount exceeding insurance. That is the burden of every insurance company. When you're insured as a million dollars in coverage, a plaintiff is suing for several gazillion million. You don't say I'm only protecting the one million. You are pursuing the cross claims of your property owner insured against others in case there is a judgment that is beyond insurance. This is irrelevant when you get to the dollar amount. So you're saying the cross claim between 89 Jamaica and JGM was really about the rights of 89 Jamaica. Against the county. And not really about whether. The insurance company. The insurance company. That's right. The insurance company doesn't care about protecting other than its responsibility. It's not a money question for them. It's a duty to the insured to pursue that. I understand. I think I understand all of that. But I'm still trying to figure out how did the case come out worse for you because you are the plaintiff here. It doesn't come out worse for 89 Jamaica because they're fine. Their settlement was an amount that. But we step in their shoes. All of their insurance coverage, no matter how it was whacked up between the insurance companies. So how did this case come out worse for you? Because Dongbu reneged on what seemed to be a promise to put in all its money. There was a settlement negotiation that took place. It comes to a certain number that. So the question is, did that number change in some way? Or was you know, what is it that happened in the litigation that created more money for you to put in? Other than the fact that as between you and they, they say we don't have to pay that. Right. Well, if we had said that right at the beginning. How does the case come out differently? It's the difference between having a layer of 1 million or a layer of 2 million. I understand that. When there's a layer of 2 million, there's more reason to be assured. And exactly what we did. We stepped back and said let them run the mediation. Let them run the hiring of the experts. We can't boss them around and tell them what they have to do. They have 2 million. We're relying on their 2 million to do a good job. Don't you have to show that somehow the actual result was worse?  If there was only 1 million, A, we would have stepped in much sooner. Because what did we do in 2021 being told there's only 1 million? We jumped into that. Because we knew 1 million isn't enough to protect this. So if we knew that in 2020. You said a moment ago there was no way to know that it would only be 2 million. It could have been 6 million. It could have been. Because we needed to protect it. Okay. It's a matter of gradiation. When there's 2 million in coverage and 2 insurers, you're more responsible insurer is going to act and try to get it settled within the 2 million. We had reason to rely on them. And the experience, exactly what you see in the record, is justifiable reliance. There's 2 million there. They're good insurance companies. I'm sure they'll take care of hiring good liability experts. A, by the way, it's an elevator case. You guys don't have an elevator expert. Don't you think you should hire an elevator expert? No, no elevator expert. A, it's a case in which it's an orthopedic injury. Your orthopedist ultimately is not available at trial. Maybe you should have arranged and made sure. You're saying if you had known from the start that it was 1 million, you would have still been monitoring, but you would have been. Obviously. Just like we did in 2022. In 2022, Charlie Ruhl substituted back in as the attorney. I was there every day as monitoring, now this time monitoring Charlie's work on this. We immediately took over the defense. We immediately took over the negotiation with the plaintiff. That's the difference between 2020 and 2022. When you made clear there's only 1 million in line, we knew we've got to jump into action. When you told us there's 2 million in line, we had reasonable reliance that 2 million was going to take care of it. I hear that, but then the question, aren't there factual questions as to whether if you had gotten into the case earlier, the ultimate settlement would have been any different than what it turned out to be? Yeah, absolutely, Judge. The mere fact that you're going to trial without a liability expert and a damages expert kills you. I was there. I mean, not to bring outside of the record into the court. Well, you think you might have had to pay less, but it's not usually that courts will require showing that the outcome would have been different. It's only that you lost control of the defense. I did. I absolutely lost control, and when I took control back, it was ear-retrieved. Every plaintiff's attorney, who's a very seasoned plaintiff's attorney, knew they had us at negotiations. Our leverage was done at that point. We were compromised beyond any ability. We had no liability expert, no damages expert, and had to pick a jury. I guess I'm going to ask the following question. So we have these two competing interpretations of the 2020 letter. Yes. The opposing counsel says the interpretation is to the extent that the contractual indemnity provision is triggered will provide coverage, and your interpretation is we've already decided that the provision is triggered, and so therefore we agree to provide coverage, right? Yes. How could you have that interpretation of the letter if at the time they sent it, there's ongoing litigation over whether there is contractual indemnification? Like the context in which the letter was sent, how could it allow you to conclude that Dongbu and Yejia had determined they owe money under the contractual indemnification provision? I think that undoes their argument, if nothing else, Judge, as I tried to explain before. Even if Dongbu had been the insurer who had to hire a separate lawyer to represent 89 Jamaica, they could not abandon 89 Jamaica's claims against contractual claims. Those are claims that belong to 89 Jamaica. They don't belong to the insurance companies for insurance companies to play around about your limits, my limits. Even if they had hired the lawyer. Justice Breyer, you're saying the litigation was really about the rights of 89 Jamaica and JGF. Right. But there was an understanding between the insurance companies where you think Dongbu was saying, all right, yeah, our insurer is litigating this, but we are pretty confident they're going to lose, so we're going to provide coverage? That's essentially it, Judge, because as I said before, New York law, if nothing else, is about the insurance companies being clear and expressing denials and reservations of rights. This is not a letter of if. If is an invention that counsel has written into this letter. This is a letter that says without reservation of any rights. That is magic words in the insurance industry. So the JGF claim doesn't change the interpretation of the letter because you're saying that if 89 Jamaica had prevailed, maybe you'd get more from JGF than you were entitled to under the Dongbu policy? No. What that letter explained is, and insurance companies do this all the time because the insurance law in New York requires you to explain your reasoning when you have a coverage decision. They're explaining their logic in terms of why they've decided to say we agree. We're going to defend and identify without reservation. When another insurance company receives that, they know that for their million, they're obligated to do the defense and indemnity. These are not boilerplate words. These are important words. There's nothing more important to insurance companies than the words defense and indemnify. The contractual claims doesn't come to play with the two insurance companies unless they said in their letter, we're only going to pay our million, never mind the fact that you're pursuing the tenant for anything above our million, measly million dollars. Never mind that. But we're going to pay our million only if you prove contractual claims. That would be a reservation of rights. We would only defend and indemnify. They could have said that. They could have said that. And that would have been a different issue and we wouldn't have acted the way we acted. We would have acted the way we acted in 2022 immediately if we knew that they were not putting their million on the line. So in the absence of this letter, you don't think that the policy itself gives you any entitlement to a payment? I'm not arguing that latter point, Your Honor. Yes. I think there's an argument to be made on that point. But the whole case and their whole brief misreads what this case is about. Their whole case is justifiable reliance on this letter. This case is not about contractual claims. This case is not about whether one tenant or the other tenant or who owed what first. Those issues were kept by the insurance company. The contractual claims, as I say before, I know it may be unusual when you're not dealing with insurance, but insurance companies do this all the time. They hire separate attorneys to represent one entity suing their other entity because they're obligated. Do you expect that Enon Jamaica was going to win summary judgment on the contractual identification claim? Yes. We thought they should have won that. As a matter of fact, the court said issue is a fact and it was preserved for trial. And that's why it was some leverage to try to get ultimately they put up $250,000 of their money as part of the total package of settlement on behalf of their insurance. You're saying that was based on a kind of probabilistic assessment? I don't know what it was based on, but at the point of trial, everything was at play. We negotiated as best we could with the plaintiff. And one of the things that was still alive was if this plaintiff, who had reverted up to like a $6 million demand, if I remember correctly at the time of trial now, because the plaintiff really knew they had us. If they really hit a number, the contractual claim would have been a reason for them to be concerned about their insured having uninsured exposure, which is bad faith land for insurance companies. So they put up $250,000. I don't want to read into their mind as to what their logic was, but the contractual issue was at play at the time of trial. We couldn't end the contractual claim until we settled for plaintiff and made sure our insured wasn't exposed to anything. And we absolutely relied on them taking care of business in 2020, and we absolutely jumped into action in 2022 when we knew that they reneged on that and we knew how important not having that second million was. Thank you, Your Honor, unless there's any other questions. We'll hear about it. So what counsel said, Your Honor, is that their reliance is based on one thing, because there was an issue with the experts. And because of that issue, the plaintiff knew that he got them, the plaintiff knew that he was in a bad position and they had to settle. But what counsel didn't tell you is that at A119 and 125 and 127, monitoring counsel, Penn Star, asked KBIC for an expert and radiologist, and KBIC denied it. Why didn't they appoint an expert? Why didn't they do that? And the other medical expert who wasn't able to testify was not JGF's. It wasn't DB's expert. It wasn't even 89's expert. Why does that matter? I mean, the question is not whether the party that offered coverage did something for judicial litigation. The question is whether the party that thinks it's entitled to coverage lost some control of the defense or behaved differently in the defense than it otherwise would have. Does it really matter who's paying for the defense? What matters is whether Penn Star would have acted differently, right? And Penn Star could have. And they're pointed to these examples. But they didn't. And they didn't. That is the prejudice inquiry, right, whether they would have done something differently. But they didn't do. But they're pointing to DB, right, and DB is, in short, saying this is because of you. How is it because of us when it wasn't even our experts? Their own attorneys didn't appoint experts. I get that you weren't controlling the appointment of the experts. But I'm just not sure why that matters if the question is whether Penn Star is detrimentally relying on the promise of coverage. Maybe Penn Star would have acted differently with respect to the KBIC appointed counsel because they thought they were getting coverage from Donald Trump. That was prejudice, wasn't it? They weren't relying on the defense. We heard it. They were relying on the $1 million. That is separate than controlling their defense. But yet they're pointing to that to say we were prejudiced because we didn't have your $1 million. And I'm saying that's apples and oranges. That's two different things. Why don't you, why doesn't a reasonable insurer make different decisions about how much they get involved in a case based on how much is at stake for them in the case? So DB wasn't involved at all in this defense, not for its insured and not for anybody else's insured. KBIC was funding it, right? So the attorneys are the people. Right, right. But Dong Bu was offering not just to defend but also to indemnify up to the limits of its policy. So if they were agreeing to put in $1 million, what he's saying is it's a reasonable decision to say, well, we don't particularly like how KBIC's lawyer is handling this, but we've got a cushion of $2 million. We're comfortable that that plus some amount of our policy will take care of our client, our insured. So we'll let it go. But they might not have let it go, and they didn't let it go once they were told that they didn't have the extra $1 million in coverage. Now that's a theory, and maybe that's something that is worthy of a trial. I don't know. But why isn't that prejudice if that's what happened? Well, let me bring it back to this. If they weren't, and the path has already been, and we believe what they say, and we adopt their facts, and the path has already been created, then why, and we still didn't get an answer, why was a third-party action, not cross-claims, because we were the mind? Why would you need to do that? Because their main job here is to make sure that their insured is protected. They arrived at a settlement. It was a reasonable settlement for the case, and the only question is, who should pay how much of that settlement? So if they believe that their insured was protected, they must have believed that their insured was protected, or else they had three, I'm hearing, three attorneys. We have counsel, we have Charlie Rue, we have defense counsel. Yet nobody thought of getting their own expert witness. They never named an expert witness. That was their decision. They made that decision on day one in 2014. They could have named the expert witness until the time of trial. They didn't. So how is that a result of this? You said that there was no answer about discontinuing the third-party action, but opposing counsel did provide an answer. He said that that was really about the rights of the insured versus the other insured, the landlord versus the tenant, and the disputes between insurance companies would be handled separately. So it didn't really inform the question of the understanding of the 2020 letter. What do you think about that? At that point, 89th Street, 89th Jamaica, is Penn Star. If you want your $1 million back, and you know by the time that this settlement happened, you didn't have Dungboo's $1 million, the only way you can get it is through contractual indemnity. That's the only way you were going to get it, and you gave up that right. Not only did you discontinue. You had already conceded that back in the first place. That changes their whole litigation strategy through the whole thing. I'm sorry. If they thought from the beginning that you had already agreed to put in your $1 million. Okay. And say that we believe that the 2020 letter was a concession of our $1 million. Yes. In 2022, it was made abundantly clear that they were not going to get the $1 million. In fact, in 2021 at the mediation, it was made abundantly clear. We are not giving you our policy limits. And they still discontinued three years later. Was discovery completed in the underlying case at that point? In the underlying main case. Yes. Not the third-party action. The Court in the summary judgment decision said that liability was unclear, was unresolved. It could still be litigated. It could still be litigated. But the important thing is what they are going to wind up owing is perhaps dictated by the fact that they don't have any protection at trial because they don't have any experts at that point. And you're saying, oh, they could designate an expert up to the time of the trial. I don't know how it works in New York State court. In my courtroom, that wouldn't be the case. If discovery was completed on the underlying case of the plaintiffs and they didn't give advance notice of who their experts are going to be and have an expert report and have that expert deposed and all that stuff, it's too late on the eve of trial to reopen discovery. So now we want to come with an expert that we never put in before. Well, there's no expert discovery, right, in State court. My point with the expert is there was never one ever contemplated on behalf of 89th, regardless of DB's position. So how can that be prejudicial? How can that be reliance? How could your strategy have changed? Your strategy all along was to never, from 2014, six years before that letter, you never intended to have an expert or else you would have. Judge, I'm sorry. We didn't discuss the extra contractual portion of the judgment. I don't know if the court wants to hear on it or just rely on it. It's a little late to bring it up now. It's in the brief. We understand. Okay. Thank you for your time. May I please correct one item you just touched on? One of the first things that we did when we came in 2022 into the case is we moved to the court to allow us to hire experts, and it's in the record. The court denied the motion to have an expert at trial. It's in the record. Thank you both. We have the briefs and we have the record. I will take the matter under advisement.